**ASSOCIATION FOR PRESERVATION OF 1700 BLOCK OF N STREET, N.W. AND VICINITY, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**Young Men's Christian Association of Metropolitan Washington, D.C., Intervenor.**

**No. 12202.**

District of Columbia Court of Appeals.

Argued Jan. 25, 1978.

Decided March 29, 1978.

---

Nicholas A. Addams, Washington, D. C., for petitioners.

S. Perry Jones, Asst. Corp. Counsel, Washington, D. C., for respondent. Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., also entered an appearance for respondent. Respondent adopted the brief of the intervenor.

Norman M. Glasgow, Washington, D. C., with whom Whayne S. Quin and Iverson O. Mitchell, III, Washington, D. C., were on the brief, for intervenor.

Before NEWMAN, Chief Judge, and GALLAGHER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

This is a petition for review of an order of the District of Columbia Board of Zoning

Adjustment (BZA).[1] The order denied the appeal of petitioners and upheld the decision of the Zoning Administrator that the proposed building of the Young Men's Christian Association of Metropolitan Washington (Metro YMCA) is a private club within the meaning of D.C. Zoning Regulation, art. 12, § 1202.[2] Petitioners raise one principal issue for our review: whether the BZA erred in upholding the Zoning Administrator's determination that the Metro YMCA facility is a private club within the applicable definition.[3]

The site of this proposed Metro YMCA facility is at 1701 Rhode Island Avenue, N.W., which is located in a Special Purpose (SP) district.[4] On October 1, 1975, the Zoning Administrator's office issued a memorandum to the BZA stating that the then "proposed YMCA Functions Building (private club)" required the BZA's approval for a special exception to erect roof structures and for a variance from the parking requirements. Petitioners (the Association) intervened to contest the granting of both the exception and the variance and also attempted to dispute the Zoning Administrator's determination that the Metro YMCA is a private club. The BZA granted the Metro YMCA's application for the special exception and the variance, and concluded that the private club issue was not properly before it. Meanwhile, petitioners filed with the BZA an appeal from the Zoning Administrator's private club determination.

On May 3, 1976 the BZA decided the appeal adversely to petitioners, but did not issue its final order until a year later. The BZA concluded that: (1) the Association had not presented persuasive evidence to support its position; and (2) the Metro YMCA satisfied all the requirements of the private club definition found in Zoning Regulation, art. 12, § 1202. That definition reads as follows:

> Building and facilities or premises used or operated by an organization or association for some common avocational purpose such as, but not limited to, a fraternal, social, educational or recreational purpose, provided that the organization or association is a non-profit corporation and registered with the U.S. Internal Revenue Service, that goods, services, food and beverages are sold on the premises only to members and their guests, and that office space activities are limited to that necessary and customarily incidental to maintaining the membership and financial records of the organization.

The Association has petitioned us to review the conclusion of the BZA, claiming that the conclusion is not only erroneous, but also supported by inadequate findings.

In reviewing this order our duty is to determine whether the findings are supported by substantial evidence in the whole record and whether the conclusions flow rationally from those findings. *Wieck v. District of Columbia Board of Zoning Adjustment*, D.C.App., 383 A.2d 7, 9 (1978); *Dietrich v. District of Columbia Board of Zoning Adjustment*, D.C.App., 320 A.2d 283, 285 (1974). If the BZA's decision to uphold

---

1. The order was issued in BZA Case No. 12139.

2. These same parties were before a different panel of this court in a petition for review of BZA Order No. 12045, in which the BZA granted to the Metro YMCA a variance from certain parking requirements and a special exception to erect certain roof structures. The decision in that case is reported in a subsequent opinion issued today. *Ass'n for Preservation of 1700 Block of N Street, N.W. v. BZA*, D.C.App., 384 A.2d 674 (No. 10903, decided this date). It was necessary to decide here whether the YMCA facility is a private club before reaching the parking restriction issue presented in No. 10903.

3. Petitioners also complain that, though requested to do so, the BZA declined to incorporate the prior record and file of Metro YMCA Application No. 12045. Petitioners contend this was a procedural error and resulted in a longer hearing as additional witnesses were required. We find no substance to this contention.

4. Private clubs are permitted as of right in an SP district. Zoning Regs., art. 41, §§ 4101.3, 4101.31; art. 31, §§ 3105.3–.31 3104.3, 3104.39. Petitioners were attempting to prove that the YMCA facility is not a private club so that the YMCA would not be able to construct and operate the facility there as a matter of right.

the Zoning Administrator's determination is supported by substantial evidence, then "we must affirm its action even though we might have reached another result, for it is not the function or authority of the reviewing court to superimpose its opinion upon the legitimate action of an administrative agency." *Coakley v. Police and Firemen's Retirement and Relief Board*, D.C.App., 370 A.2d 1345, 1347–48 (1977). This court must also show great deference to the administrative construction and interpretation of the regulations the agency enforces. *Coakley, supra* at 1348–49; *Barber v. District of Columbia Department of Human Resources*, D.C.App., 361 A.2d 194, 198 (1976); *see also Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Unless the BZA's interpretation is clearly erroneous or inconsistent with the regulations, we must defer to its decision on the meaning of a private club. *See Taylor v. District of Columbia Board of Zoning Adjustment*, D.C. App., 308 A.2d 230, 232 (1973); *see also Udall v. Tallman, supra* at 16–17, 85 S.Ct. 792; *Barber, supra* at 198.

Petitioners specifically attack the BZA's decision with respect to four essential elements of the definition of a private club. We turn now to our evaluation of the evidence in light of each of those elements.

First, petitioners dispute the BZA's finding that the Metro YMCA is "organized and operated for common avocational purposes, including educational and recreational." The Association argues that the Metro YMCA's activities are vocational in nature, for the benefit of the public in general and not a private club for the social benefit of its members. It relies principally on this court's discussion on the meaning of a private club in *Legislative Study Club, Inc. v. District of Columbia Board of Zoning Adjustment*, D.C.App., 359 A.2d 153 (1976) and on the Gladstone Report in evidence.[5]

In *Legislative Study Club, supra*, we were presented with the issue of whether the BZA had erroneously concluded that the alleged club was not a private club under the prior definition found in former Zoning Regulation, § 1202. We upheld the BZA's determination that the petitioner was a nonprofit organization and not a private club. *Id.* at 155. Our decision and discussion in that case is of limited value here since we construed in very general terms the former definition (§ 1202), which was more narrowly written. It provided, in pertinent part, that a private club is "*a building* or portion thereof used by an association for the promotion of a common social objective and not for profit, where facilities are limited to its members and guests . . . .." We said that a "private club" was intended to cover personal, social matters, while a "nonprofit organization" was aimed at nonpersonal, service-type activities. *Legislative Study Club, supra* at 155. The BZA found the activities of that "club" to be vocational as opposed to avocational because it " 'operate[d] as a clearing house for class groups by studying specific pieces of legislation and disseminating information to those groups regarding issues such as consumer affairs and public information.' " *Id.* We think the activities of the Metro YMCA are substantially different in nature from those found to be vocational in *Legislative Study Club*.

The word vocation is defined as "[o]ne's calling or business . . .. [t]he activity on which one spends [the] major portion of his time and out of which he makes his living."[6] Avocation is defined in opposite terms as meaning "[a] calling away, a diversion, suggesting [the] idea of smaller affairs of life, or occasional employments as distinguished from one's ordinary or principal occupation."[7] There is ample evidence to support the BZA's finding that the Metro YMCA is organized and operated for educational and recreational purposes, among other common *avocational* objectives. Metro YMCA's Charter says the organization is designed to promote "reli-

---

5. What is here referred to as the Gladstone Report is a marketing study prepared for the Metro YMCA by Gladstone Associates.

6. Black's Law Dictionary (4th ed. 1957).

7. *Id.*

gious, moral, educational, and benevolent purposes . . .." That charter provision was at least a partial basis for the Zoning Administrator's decision that the "common avocational purpose of the club is to improve the spiritual and mental, social and physical conditions of men and women." His decision was also based upon evidence of courses given by the Metro YMCA which he considered spiritual.

There is a schedule of activities for members and nonmembers which details: (1) the percentage of time particular facilities are available; (2) the percentage of square feet of space for each particular program; (3) the percentage of income derivable from each program; (4) the purpose of each program; and (5) whether membership is required for each program. This schedule divides Metro YMCA's activities into three principal categories. First is the health and physical education program which is designed to achieve good physical and mental health in youth and adults. Second, the youth outreach and development program is aimed at changing the conditions that foster delinquency and crime. Third, the international and intercultural program's purpose is to work for international understanding and world peace. The first program, health and physical education, appears to be the foremost function for members with its facilities available one hundred percent of the time, seventy-nine percent of the space being dedicated to that use, and providing eighty-one percent of the income to Metro YMCA.

Against this evidence, petitioners argue only that the responses of YMCA members to a survey contained in the Gladstone Report indicate no common avocational purposes. Those responses generally showed that convenience of location, availability of facilities, and favorable rates were the primary reasons for membership for those surveyed. The fallacy of this is that no one is apt to join a club solely on account of convenience or for favorable rates, unless the club offers to fulfill some particular need or desire of that individual—whether that is eating, exercise, amusements, or any other avocational purpose. Convenience

and favorable rates may then be decisive factors in an individual's choice of a particular club. The availability of facilities is a response which cuts against petitioners' argument, since the Metro YMCA seeks to offer a wide range of educational and recreational facilities in order to attract members who share the avocational purpose of achieving better mental and physical health. None of these responses tend to indicate any vocational purposes for membership. Consequently, in light of the evidence supporting the BZA's finding on the existence of common avocational purposes, we see no merit to the contention.

The Association next attacks, as unsupported, the BZA's findings that the Metro YMCA is a nonprofit corporation even though so registered with the Internal Revenue Service (IRS). The Zoning Regulation, art. 12, § 1202 requires that a private club be "a non-profit corporation and registered with the U.S. Internal Revenue Service . . .." Petitioners do not dispute that Metro YMCA is registered with the IRS as a nonprofit corporation. However, they construe the conjunctive "and" contained in the regulation as imposing two separate requirements. This first requirement—that the Metro YMCA be a nonprofit corporation—petitioners argue, is not met by evidence of the YMCA's status in the eyes of the IRS. They assert that the Metro YMCA is not nonprofit because its health and recreational facilities will produce a profit. Even if we were to assume that their reading of the conjunctive "and" is correct, their argument would stand or fall on proving the Metro YMCA will make a profit. The sole evidence to support this contention is found in the Gladstone Report which indicates that the new facility will offer its athletic facilities at rates that are expected to be lower than at other available facilities. That evidence does not directly support petitioners' contention that the Metro YMCA's athletic facilities will make a profit, much less that the Metro YMCA as a whole will make a profit.

In contrast to the absence of affirmative evidence adduced by petitioners to

show the profitable nature of the Metro YMCA, the evidence to support the BZA's conclusion to the contrary is both strong and uncontroverted. The YMCA was chartered by an act of Congress as a nonprofit corporation. (Act of June 28, 1864, 13 Stat., L.411.) It is registered with the IRS as a tax-exempt organization under I.R.C. § 501(c)(7). It is exempt from the D.C. Sales Tax. Furthermore, there was testimony that the YMCA lost $100,000 in its operation at the old G Street location in 1975. The conclusion that the YMCA is a nonprofit corporation and registered with the IRS flows rationally from the findings, which are supported by substantial evidence.

The third element to be considered is the requirement that "goods, services, food, and beverages are sold on the premises only to members and their guests, . . ." Zoning Regulation, art. 12, § 1202. Construed strictly, the Metro YMCA would not satisfy this element of the definition, because the Metro YMCA admits that some of its services are available to persons not members and not guests. A brief glance at the schedule of activities offered by the YMCA shows that many programs, if not all, are open to members and to nonmembers, who must pay a higher fee due to their nonmembership. Furthermore, petitioners point out that Metro YMCA will serve as a training center for staff members of the youth outreach program and as a counseling service for foreign-born residents in the Washington Metropolitan area.

The BZA found that

[g]oods, services, food, and beverages are sold on the premises only to members and their guests. The fact that the YMCA proposes to make some of its facilities available for the betterment and welfare of the general public of the Metropolitan area as well as for its members, does not alter its principal use. The YMCA activities available are such to maintain the membership.

The Zoning Administrator testified that the Zoning Regulations express no intent to prohibit any and all subordinate or occasional uses, even if outside the scope of the principal use. He referred to Zoning Regulation, art. 41, § 4101.52, which provides that "any other *accessory use* and *accessory building* customarily incidental to the uses otherwise authorized by this section [are permissible]." He also testified that prior to making his determination, he examined a submission of the Metro YMCA that indicated a very small percentage of its income was derived from nonmembers.[8] The Zoning Administrator stated that even if the Metro YMCA derived as much as twenty percent of its income from nonmembers, he would consider that to be incidental usage under Zoning Regulation, art. 41, § 4101.52.

Petitioners argue that what the Zoning Administrator and the Metro YMCA consider accessory uses are actually the predominant uses of the facility. The Association introduced no evidence which supports its contention. Rather, it relied exclusively on its unsupported assertion that the YMCA is a commercial health facility and on the fact that the YMCA offers certain services to nonmembers.

■ There is no evidence to show the percentage of use of the facility by nonmembers, but there is evidence to show the percentage of income derivable from their use. As previously indicated, documentary evidence shows that membership use of the health and physical education facilities generate eighty-one percent of the YMCA's total income, and that nonmember usage of the same facilities accounts for less than one percent of income. No other income comes from nonmembers, according to the schedule of activities. Except for the youth outreach and development program, which generates six percent of total income—all from members—the funding for all the other programs for members and nonmembers comes from grants and YMCA partner memberships. The Zoning Administrator

---

8. There was evidence in the record indicating that less than one percent of all income to the YMCA comes from nonmembers.

testified concerning a YMCA submission which similarly indicated a very low percentage of income derivable from nonmembers. On this record, we cannot say that the BZA's finding was without substantial support, nor can we say its conclusion that the Metro YMCA satisfied this part of the definition of private club is unreasonable or clearly erroneous.[9]

We consider the BZA's conclusion that the YMCA is a private club, as defined, is neither unreasonable nor clearly erroneous.

The decision of the BZA is

*Affirmed.*

**9.** Petitioners also argue that the Metro YMCA failed to satisfy the requirement that the office space and activities are not "limited to that *necessary and customarily incidental to maintaining the membership and financial records* of the organization." Zoning Reg., art. 12, § 1202. They argue that any records pertaining to nonmember activities kept at the Metro YMCA would violate that requirement. As we have indicated, some incidental, accessory uses by nonmembers are permissible. Keeping records of those nonmember activities is a reasonable, necessary, and incidental use accessory to the keeping of records on membership activities.