**CONCERNED CITIZENS OF BRENTWOOD, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,**

**Square 3942 Associates Limited Partnership, Intervenor.**

No. 91–AA–1477.

District of Columbia Court of Appeals.

Argued March 11, 1993.

Decided Dec. 22, 1993.

---

Tony Norman, with whom Sanford Speight, Washington, DC, was on the brief, for petitioners.

C. Francis Murphy, with whom Norman M. Glasgow, Jr., Washington, DC, was on the brief, for intervenor.

John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, filed a statement in lieu of brief for respondent.

Before FERREN and TERRY, Associate Judges, and GALLAGHER, Senior Judge.

TERRY, Associate Judge:

Petitioners challenge an order of the Board of Zoning Adjustment (BZA) holding that Square 3942 Associates Limited Partnership ("the applicant") may build and operate as a matter of right, without obtaining a variance, a facility to collect, sort, compact, and ship recyclable waste materials on a lot that it owns in Northeast Washington, which is zoned for commercial and light manufacturing use. The Zoning Administrator had concluded that the proposed use was not permitted as a matter of right in a commercial-light manufacturing (C–M) district[1] and, consequently, that a variance was required. The applicant sought a variance from the BZA, but the BZA concluded that a variance was not needed because the proposed use constituted a "processing establishment," a use permitted as a matter of right in a C–M district.

The present petition for review was filed by an unincorporated organization of citizens and by four individual property owners who live near the property at issue. Two of the individual petitioners contend that the BZA improperly refused to allow them to intervene in the proceedings below, and all of the petitioners maintain that the BZA violated District of Columbia law by failing to address the concerns of the affected Advisory Neighborhood Commission (ANC) and the District of Columbia Office of Planning, and further violated the law by failing to obtain an environmental impact statement. Petitioners also contend that the BZA erroneously construed the zoning regulations in concluding that the proposed use would be allowed as a matter of right in a C–M district. We hold that the BZA erred in denying the request for intervention, but that in the particular circumstances of this case, given the nature of the proceedings and the narrowness of the issue before the BZA, that error was harmless. Finding no other error, we affirm the BZA order.

I

The applicant applied for permits to allow construction and operation of a facility designed to collect, sort, compact, and transport recyclable waste materials (glass, paper, plastic, steel, and aluminum) at a property it owns on W Street, N.E.[2] Operation of the proposed facility, described in the application as a "consolidated industrial processing center," would entail four related activities: (1) collection of cans, bottles, plastic containers, and paper; (2) sorting and segregating these materials; (3) compacting the segregated materials into bales; and (4) loading and transporting those bales for sale to recycling facilities outside the District of Columbia. The processing center, as proposed, was to

1. The relevant zoning regulations governing C–M districts are found at 11 DCMR §§ 800–806 (1991).

2. The property, known as Square 3942, is described in the BZA order as follows:

Square 3942 is triangular in shape and is bounded by W Street to the south and southeast, Brentwood Road to the west, and 13th Street, N.E., to the north. The subject property fronts on both W Street and Brentwood Road. There is ... an existing auto service shop at the corner of W Street and Brentwood Road which abuts the subject site to the west. To the north of the site is a small, recently constructed shopping center. Also to the north is a block of residential rowhouses facing 13th Street. These rowhouses are separated from the site by an alley and are approximately 200 feet from the proposed site. To the east of the site there are commercial-light manufacturing uses, including a demolition company. The site abuts an M (general industry) district to the south.

A third party, Consolidated Waste Industries, Inc. (CWI), has been using the property, which is essentially unimproved, as a parking lot for its trash trucks. CWI will operate the proposed facility if it is built.

be built in two phases. The first phase would include the construction of a 15,000–square–foot building in which the collected materials would be sorted, compacted, and baled, an administrative office, a maintenance facility, an educational and training center, and parking areas. The second phase was to be a doubling of the size of the main building and an expansion of the parking areas.

The applicant's property is located in a C–M–1 district.[3] Under the zoning regulations, C–M districts are "intended to provide sites for heavy commercial and light manufacturing activities employing large numbers of people and requiring some heavy machinery under controls that would minimize any adverse effect on other nearby, more restrictive districts." 11 DCMR § 800.1. Uses permitted as a matter of right in C–M districts include the operation of hotels and inns, moving or hauling terminals or yards, commercial athletic fields, research or testing laboratories, incinerators, motorcycle sales facilities or repair shops, laundries and dry cleaning plants, public utility pumping stations, repair garages, wholesale or storage facilities, "any light manufacturing, processing, fabricating, or repair establishment," jails and correctional institutions, and any commercial uses permitted in C–4 districts. *See* 11 DCMR § 801.6–801.7; *see also* 11 DCMR § 740.8 (listing uses permitted as of right in C–4 districts).

Shortly after the application was filed, the Zoning Administrator informed the applicant that the proposed use of the property was not permitted as of right in a C–M district; accordingly, the applicant requested a variance from the BZA.[4] On June 26, 1991, the BZA held a public hearing on the request for a variance ("the first hearing"). After the applicant had discussed the proposed use of the property and the BZA had received a report from the Office of Planning recommending denial of the variance, the BZA abruptly "suspended" the hearing and directed the applicant to seek reconsideration of the Zoning Administrator's decision because, in its view, "the request for a use variance may be inappropriate in light of the permitted uses in C–M–1 districts and the applicant's proposed use."

A few days later, on July 2, the BZA *sua sponte* sent a memorandum to the Zoning Administrator asking him to reconsider his finding that the proposed use required a variance. The memorandum stated in part:

> The Board requests that you reconsider your decision to require the proposed use to seek a variance from the use provisions (Section 801) of the C–M–1 District as stated in your letter of April 8, 1991 to [the applicant]. The Board requests that you consider the matter-of-right provisions of Paragraph [801.7](j), "Any light manufacturing, processing, fabricating, or repair establishment."

The Zoning Administrator, however, did not change his mind. On August 9 he notified the BZA that he had met with representatives of the applicant "for the purpose of obtaining further information and clarification" about the proposed use of the property and that he was "still of the opinion that there is need for BZA approval...."

The applicant then returned to the BZA, renewing its appeal from the Zoning Administrator's original decision and also appealing from his reaffirmation of that decision on August 9. A new public hearing was held ("the second hearing"), at which testimony was given by the applicant, the manufacturer of the equipment to be used in the proposed facility, the Zoning Administrator, District of Columbia Councilman Harry Thomas, Jr., and three representatives of ANC 5–B, one of whom was also the spokesman for petition-

---

**3.** The zoning regulations of the District of Columbia provide for three types of C–M districts (C–M–1, C–M–2, and C–M–3) which differ from one another in their maximum allowable building heights and floor area ratios. *See* 11 DCMR §§ 800.3, 840, 841. The fact that the property at issue here is zoned C–M–1, rather than C–M–2 or C–M–3, is of no consequence in this case.

**4.** *See* D.C.Code § 5–424(g) (1988) (authorizing BZA in certain circumstances to grant variances from the zoning regulations); *see generally Tyler*

er Concerned Citizens of Brentwood.[5] In addition, a number of individual citizens sought to intervene at the second hearing, but the BZA denied their request for intervention, stating that the ANC would represent their views.

On September 27, 1991, the BZA issued its order concluding that the proposed use was permitted as a matter of right in a C–M district. The BZA found, first, that the proposed use was generally consistent with the broad description of activities permitted in C–M districts under the zoning regulations.[6] Next, the BZA noted that section 801.7(j) of the regulations permits the operation of "[a]ny light manufacturing, processing, fabricating, or repair establishment." Since the regulation left the term "processing" undefined, the BZA adopted the dictionary definition of that term[7] and concluded that the proposed use was a "processing ... establishment" within the meaning of section 801.-7(j):

> The [applicant] maintains that in operation of the facility, CWI will only collect, separate, bale, and ship five different types of material that will subsequently be recycled at a facility located away from the site. In the Board's view, the procedures described in the [applicant's] testimony, and shown in the video tape, demonstrate that CWI will subject the materials collected to a particular method of handling (collecting, separating, and baling) to effect a

particular result (having marketable units to sell to recycling facilities). Thus, the term "processing" appears to apply to the activities that will take place at the site.

Accordingly, the BZA reversed the decision of the Zoning Administrator and held that the applicant was entitled to build and operate the proposed facility without first obtaining a variance.

Petitioners challenge the BZA action in several respects. They contend that the BZA improperly refused to allow certain of the petitioners to intervene, failed to give adequate consideration to the views of the ANC and the Office of Planning, and failed to obtain an environmental impact statement as required by law. They maintain further that the BZA misconstrued the zoning regulations governing C–M districts when it concluded that no variance was required.

II

A. *Intervention in BZA Proceedings*

Twenty-one individuals sought leave to intervene at the second hearing.[8] BZA Chairwoman Carrie Thornhill asked each of these persons to identify himself or herself for the record and to state the basis for requesting intervention. At first Chairwoman Thornhill intimated that persons living within 200 feet of the property would be allowed to intervene.[9] After these individuals had identified themselves and announced their opposition to

---

*v. District of Columbia Board of Zoning Adjustment,* 606 A.2d 1362, 1365 (D.C.1992).

**5.** J.R. Richardson, the ANC Commissioner for the area in which the property is located, stated at the second hearing that he was testifying both in his capacity as an ANC Commissioner and on behalf of Concerned Citizens of Brentwood.

**6.** For example, it noted that the purpose of C–M districts is "to provide sites for heavy commercial and light manufacturing activities employing large numbers of people and requiring some heavy machinery." Order at 11 (quoting 11 DCMR § 800.1). In addition, the BZA observed that "heavy truck traffic and loading and unloading operations shall be expected to be characteristic of C–M districts." Order at 12 (quoting 11 DCMR § 800.2).

**7.** The BZA looked to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1969), which defines the verb "process" in part as follows:

to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result; ... to prepare for market, manufacture, or other commercial use by subjecting to some process; ... to make usable by special treatment ... [for example,] processing waste material....

*Id.* at 1808.

**8.** Two of those twenty-one persons, Sally Franklin and Sarah Brown, are petitioners in this case. However, the lead petitioner, Concerned Citizens of Brentwood, did not seek to intervene below; consequently, we consider here only the BZA's denial of intervenor status to Franklin and Brown.

**9.** After the first person had come forward and given his name and address, Ms. Thornhill asked, "Do you live within 200 feet of the property?"

the granting of a variance, however, Ms. Thornhill suddenly declared that no one would be permitted to intervene and that "the ANC is expected to represent the interests of all of those persons, and that [way] we would not need to have all of those persons testify."

In its order the BZA gave a different rationale for its decision not to permit any of the twenty-one citizens to intervene:

> The Board polled the audience at the public hearing to determine whether intervenor status should be afforded to anyone present. There were no written requests for intervenor status submitted to the Board. The twenty-one members of the audience who spoke gave their names and addresses and expressed opposition to the proposed facility based on their perception of what effect the operations would have on the surrounding area.... No one expressed a view as to whether the proposed use meets the requirements of Subsection 801.7(j) of the Zoning Regulations. The Board, therefore, decided that intervention would be inappropriate and that the Advisory Neighborhood Commission could adequately represent the views of the residents.

 Petitioners Franklin and Brown contend that the BZA improperly refused to allow them to intervene, thereby violating the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code §§ 1–1501 to 1–1510 (1992).[10] They argue that this refusal significantly prejudiced their ability to participate in the hearing because it rendered them unable to present rebuttal evidence or to cross-examine witness, which they could have done if intervention had been granted and they had been accorded status as parties.[11] The applicant responds that the BZA correctly refused to permit intervention be-

cause the affected petitioners did not submit a written request to intervene before the beginning of the second hearing.

The regulation governing intervention in proceedings before the BZA grants the BZA substantial discretion in deciding whether, and to what extent, it will allow an individual or group to intervene in matters coming before it. It provides:

> At the time of the hearing on the appeal, the Board may, in its discretion and for good cause shown, permit persons who have a specific right or interest that will be affected by action on the appeal to intervene in the appeal for such general or limited purpose as the Board may specify.

11 DCMR § 3315.12. But the broad discretion which this regulation gives to the BZA must be exercised reasonably, not arbitrarily or capriciously. *See Glenbrook Road, supra* note 10, 605 A.2d at 39. In this case, we conclude, the BZA's action was unreasonable. It announced a standard by which intervention would be permitted, and then, when confronted with persons meeting that standard, it abruptly decided not to permit intervention by anyone. The law requires more. *See Dankman v. District of Columbia Board of Elections & Ethics,* 443 A.2d 507, 513 (D.C.1981) (en banc) (once an agency adopts a given procedure, it must adhere to that procedure); *accord, e.g., Macauley v. District of Columbia Taxicab Commission,* 623 A.2d 1207, 1209 (D.C.1993) (agencies must adhere to their own regulations); *Allied Security, Inc. v. District of Columbia Department of Employment Services,* 621 A.2d 824, 827 (D.C.1993) (same); *Vaughn v. United States,* 598 A.2d 425, 433 (D.C.1991) (same); *Hanson v. District of Columbia Rental Housing Commission,* 584 A.2d 592, 595 (D.C.1991) (same).

---

10. Proceedings before the BZA are "contested cases" and are therefore subject to the requirements of the DCAPA. *See, e.g., Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment,* 605 A.2d 22, 38 (D.C.1992).

11. *See* D.C.Code § 1–1509(b) (1992) ("Every party shall have the right to ... submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts"); *see also Hilton Hotels Corp. v.*

*District of Columbia Department of Employment Services,* 531 A.2d 999, 1000 (D.C.1987) (right to submit rebuttal evidence); *Dietrich v. District of Columbia Board of Zoning Adjustment,* 293 A.2d 470, 474 (D.C.1972) (right to cross-examine witnesses); *cf. Glenbrook Road, supra* note 10, 605 A.2d at 40 (any restriction by BZA on a party's right to cross-examine "must be rationally related to some legitimate purpose").

The justifications advanced in the BZA's order for its decision not to permit anyone to intervene do not mitigate the error. First, the order makes no reference to Chairwoman Thornhill's original suggestion that persons living within 200 feet of the property could intervene, an omission which supports petitioners' assertion that Ms. Thornhill's sudden change of mind was arbitrary and capricious. Second, the order indicates that petitioners' failure to file a written request to intervene was a further basis for the decision, but there is nothing in the record to show that the need for such a request was announced in advance of the hearing so that anyone wishing to intervene could submit one. Moreover, the regulations do not require such written requests. Third, the order implies that petitioners were given an opportunity to express their views despite being denied status as intervenors. The record demonstrates otherwise: petitioners were asked to give only their names and addresses and to state how far they lived from the property. Chairwoman Thornhill specifically told them, "We are not asking you to give your statement now." Finally, the order suggests that petitioners' failure to state why the proposed use did not fall within section 801.7(j) affected the determination of their right to intervene, but they were never informed that they had a right (or a duty) to make such a statement before the BZA ruled against them.

For these reasons, we hold that the BZA's failure to establish and adhere to a procedure by which persons seeking to intervene could reasonably attempt to do so was arbitrary and capricious. *See Dankman, supra,* 443 A.2d at 513. The proper course would have been for the BZA to announce clearly, at the outset of the hearings or earlier, whether intervention would be permitted and, if so, under what conditions—and then to follow that announced procedure.

■■■ We hold also, however, that the BZA's error was harmless. The purpose of the hearing was not to decide whether to grant a variance to the applicant but, rather, to determine whether a variance was necessary at all. The applicant's appeal therefore required the BZA only to resolve a narrow legal question, namely, whether the proposed use was permissible as a matter of right under applicable zoning regulations for C–M districts. Because this court reviews the BZA's resolution of that legal question essentially *de novo,*[12] we hold that petitioners' exclusion from the case did not infringe their rights in these limited circumstances.

### B. *Procedural Matters Affecting BZA Review*

■■ By law the BZA is required to consider both the "issues and concerns" raised by any affected ANC[13] and the "recommendations" of the Office of Planning[14] in its deci-

---

**12.** "[T]o the extent that an agency's decision involves an issue of law, it is entitled to less deference from a reviewing court because the court has the greater expertise." *4934, Inc. v. District of Columbia Department of Employment Services,* 605 A.2d 50, 53 (D.C.1992) (citations and internal punctuation omitted); *accord, e.g., Brown v. District of Columbia Board of Zoning Adjustment,* 486 A.2d 37, 53 (D.C.1984) (en banc) ("application of the law to the facts ... is ultimately for this court, not for the BZA"); *see SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("an order may not stand if the agency has misconceived the law").

**13.** D.C.Code § 1–261(d) (1992) provides in pertinent part:

The issues and concerns raised in the recommendations of the [ANC] shall be given great weight during the deliberations by the governmental agency and those issues shall be discussed in the written rationale for the governmental decision taken. "Great weight" requires acknowledgment of the [ANC] as the

source of the recommendations, and requires explicit reference to each ANC issue and concern as such as well as specific findings and conclusions with respect to each.

*See also* 11 DCMR § 3307.2 (mandating consideration of ANC report by the BZA).

**14.** D.C.Code § 5–412.4 (1993 Supp.) provides in pertinent part:

The Office of Planning shall review and comment upon all zoning cases, and the ... Board of Zoning Adjustment shall give great weight to the recommendation of the Office of Planning.

This statute did not become effective until October 1, 1991, four days after the BZA issued its order in the instant case. However, we held in the *Glenbrook Road* case, *supra* note 10, that even before the statute took effect, the BZA was "required to demonstrate in its findings that it considered [the views of the Office of Planning], and must provide a reasoned basis for any disagreement with them." 605 A.2d at 34 (citation omitted).

sion-making process. With respect to the ANC, we have repeatedly held:

> The BZA is required by the D.C.Code and its own organic regulations to give issues and concerns raised by the ANC "great weight," and to discuss those issues "in the written rationale for the governmental decision taken." The "great weight" requirement obliges the agency to "elaborate, with precision, its response to the ANC issues and concerns," and to "articulate why the particular ANC itself, given its vantage point, does—or does not—offer persuasive advice under the circumstances." While the agency is not required to defer to the ANC's views, failure to address ANC concerns with particularity is grounds for a remand even if other procedural requirements are met.

*Levy v. District of Columbia Board of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990) (citations omitted); *see Kopff v. District of Columbia Alcoholic Beverage Control Board,* 381 A.2d 1372, 1384 (D.C.1977) (BZA must make "explicit reference to each ANC issue and concern *as such,* as well as specific findings and conclusions with respect to each" (emphasis in original)); *see also Bakers Local 118 v. District of Columbia Board of Zoning Adjustment,* 437 A.2d 176, 180 (D.C. 1981) (discussing remedies for failure to comply with statute or regulations).

The BZA concluded that because the ANC did not submit a written report in the instant appeal, the "issues and concerns" raised by the ANC were not entitled to "great weight." The BZA order briefly summarizes the report submitted by the Office of Planning, but does not explicitly address the issues which it raises. Even assuming, as petitioners persuasively argue, that the BZA erred in finding that no ANC report was submitted,[15] and that the consideration given by the BZA to the issues raised in the Office of Planning report was inadequate, we nevertheless conclude that these errors provide no basis for

reversal. The "great weight" requirement extends only to "issues and concerns that are 'legally relevant.'" *Bakers Local 118, supra,* 437 A.2d at 179 (citation omitted). It is beyond dispute that the issues and concerns identified by both the Office of Planning and the ANC related only to whether or not a variance should be *granted,* not whether a variance was *required* in the first place. Thus they were not "legally relevant" unless the BZA ruled that the proposed use was not allowed as a matter of right, *i.e.,* that it required a variance. Because the BZA concluded otherwise, a decision which we affirm for the reasons discussed hereafter, the issues raised by the ANC and the Office of Planning never became "legally relevant." Hence the requirement that the BZA give consideration or "great weight" to the views of these two entities did not arise.

■ Petitioners' final procedural argument must also be rejected. They contend that the BZA violated the District of Columbia Environmental Policy Act (DCEPA), D.C.Code §§ 6–981 to 6–990 (1993 Supp.), by failing to require an environmental impact statement[16] assessing the applicant's proposed use of the property. We disagree. The applicable regulation provides only that

> [n]o agency shall issue any license, permit, certificate, or authorization until completion of the environmental impact review process by the lead agency.

20 DCMR § 7203.2, proposed at 37 D.C.Reg. 7594, approved by the Council of the District of Columbia, Resolution 8–314, § 2(1), 37 D.C.Reg. 8262 (1990). The "lead agency" in this context is the District of Columbia Department of Consumer and Regulatory Affairs. 20 DCMR § 7203.1(a), proposed at 37 D.C.Reg. 7593, approved, 37 D.C.Reg. 8262 (1990).

Petitioner's invocation of the DCEPA is premature because the applicant's appeal to the BZA sought only a ruling that the pro-

---

15. The BZA's position, which strikes us as hypertechnical, was that the ANC report had been filed (and accepted by the BZA) in connection with the first hearing, in which the applicant initially sought a variance after the Zoning Administrator had ruled that one was necessary. Since the ANC report was not *refiled* in the second hearing, even though the second hearing was essentially a continuation of the first one, which had been "suspended" (not terminated), the BZA concluded that no written report had been filed by the ANC at all.

16. *See* D.C.Code § 6–983 (1993 Supp.).

posed use could occur as a matter of right in a C–M district. Since the BZA order did not result in the issuance of any "license, permit, certificate, or authorization" specified in section 7203.2, the requirements of the DCEPA were not yet applicable, and the BZA did not err in failing to await the preparation of an environmental impact statement. There may well be a need for such a statement at some time in the future, but that time has not yet arrived.

## C. *The Merits of the BZA's Ruling*

The BZA is charged with interpreting the zoning regulations promulgated by the District of Columbia Zoning Commission. *See Page Associates v. District of Columbia,* 463 A.2d 649, 655 (D.C.1983); *Keefe Co. v. District of Columbia Board of Zoning Adjustment,* 409 A.2d 624, 625 (D.C.1979). This court must defer to the BZA's interpretation of those regulations, related to matters within its expertise, unless that interpretation is plainly wrong or inconsistent with the regulations or with the statute under which the BZA acts. *Blagden Alley Ass'n v. District of Columbia Zoning Commission,* 590 A.2d 139, 142 n. 6 (D.C.1991);[17] *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *Columbia Realty Venture v. District of Columbia Rental Housing Commission,* 590 A.2d 1043, 1046

(D.C.1991). With this standard in mind, we examine the BZA's ruling.

The BZA order interpreted section 801 of the zoning regulations, which lists uses permitted as of right in C–M districts, as encompassing the use proposed by the applicant. The BZA found that the activities to be conducted on the property consisted solely of "collect[ing], separat[ing], bal[ing] and ship[ping] five different types of material that will subsequently be recycled at a facility located away from the site." It found further that "the procedures described in the [applicant's] testimony, and shown in the video tape, demonstrate that CWI will subject the materials collected to a particular method of handling (collecting, separating and baling) to effect a particular result (having marketable units to sell to recycling facilities)." It concluded that "the term 'processing' appears to apply to the activities that will take place at the site."

The applicable regulations do not expressly exclude or include the applicant's proposed use of the property as an activity which may occur as a matter of right. Section 801.7(j) of the regulations permits operation of "any ... processing ... establishment" as a matter of right in a C–M district, but the term "processing" is nowhere defined in the regulations. In this situation, another regulation directs the BZA to refer to the dictionary for the applicable definition. 11 DCMR § 199.-2(g), published in Title 11 Errata List, 39 D.C.Reg. 4204 (1992);[18] *see Wallick, supra* note 17, 486 A.2d at 1185 (discussing similarly worded predecessor to section 199.2(g)).[19]

---

17. *Accord, e.g., Levy v. District of Columbia Board of Zoning Adjustment, supra,* 570 A.2d at 746; *United Unions, Inc. v. District of Columbia Board of Zoning Adjustment,* 554 A.2d 313, 318 (D.C. 1989); *Wallick v. District of Columbia Board of Zoning Adjustment,* 486 A.2d 1183, 1184 (D.C. 1985); *Colker v. District of Columbia Board of Zoning Adjustment,* 474 A.2d 820, 821 (D.C. 1983); *Sheridan–Kalorama Neighborhood Council v. District of Columbia Board of Zoning Adjustment,* 411 A.2d 959, 961 (D.C.1979). *Compare Railco Multi–Construction Co. v. Gardner,* 564 A.2d 1167, 1169 (D.C.1989) (refusing to defer to agency resolution of a "question involv[ing] considerations generally not invoking the reasons for which courts will defer to agency expertise").

18. Section 199.2(g), part of a regulation containing fourteen pages of definitions, provides:

 Words not defined in this section shall have the meanings given in *Webster's Unabridged Dictionary.*

19. "[T]he reason why the regulations specially define some words and not others [is that] words used in accordance with their common definition need not be specially defined." *Wallick, supra* note 17, 486 A.2d at 1185. Indeed, this court has resorted to the dictionary itself from time to time in zoning cases. *See Association for Preservation of 1700 Block of N Street, N.W. v. District of Columbia Board of Zoning Adjustment,* 384 A.2d 668, 671 (D.C.1978) (using dictionary definition of term "vocation").

Adopting the dictionary definition of the verb "process," quoted in note 7, *supra*, the BZA concluded that the applicant's proposed activity was "processing" as that term is used in section 801.7(j).

We see nothing unreasonable in the BZA's reading of section 801.7(j), or in its conclusion that the proposed use of the property would constitute "processing" under that section and would therefore be permitted as a matter of right. The BZA's reference to the dictionary is mandated by the regulations, and its analysis is not irrational or otherwise erroneous. Countless cases tell us that we must uphold the BZA's ruling if there is a rational basis for it. *E.g., Citizens Coalition v. District of Columbia Board of Zoning Adjustment,* 619 A.2d 940, 947 (D.C.1993). Having determined that there is, we find no grounds for disturbing the BZA's conclusion in this case that a variance is not required.

## III

For these reasons, the order of the BZA is Affirmed.