**DISTRICT OF COLUMBIA, DEPART-MENT OF PUBLIC WORKS, Department of Consumer and Regulatory Affairs, Appellants,**

v.

**L.G. INDUSTRIES, INC., USA Waste of DC, Inc., Appellees.**

Nos. 98–CV–1692, 98–CV–1693, 99–CV–556, 99–CV–584.

District of Columbia Court of Appeals.

Argued June 15, 2000

Decided Aug. 31, 2000.

Harold L. Talisman, Washington, DC, with whom Robert R. Rigsby, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief for appellants.

Andrew D. Levy, Baltimore, MD, with whom Frederick D. Cooke, Jr., Washington, DC, was on the brief for appellees.

Before SCHWELB and FARRELL, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

Appellants District of Columbia, District of Columbia Department of Public Works, and District of Columbia Department of Consumer & Regulatory Affairs (DCRA) (collectively "the District"), appeal an order of the Superior Court enjoining them from pursuing administrative proceedings against appellees L.G. Industries, Inc. (LGI) and USA Waste of the District of Columbia while appellees' suit against the District is pending in Superior Court.[1] Appellants contend that the court either did not have jurisdiction to issue the injunction or, if it had jurisdiction, should not have exercised its jurisdiction in this case. Appellants also contend that the court failed to consider adequately the required criteria before issuing the injunction, an extraordinary remedy. Because we agree with appellants that the trial court should not have exercised its jurisdiction in this case to stay the administrative proceedings, we reverse.

## I.

### A. Pretrial Proceedings

On June 16, 1994, LGI filed an application for a certificate of occupancy for premises at 1140 Third Street, Northeast, Washington, D.C. In the application, it stated that the proposed business use would be "Shipping, Freight & Cargo, Transfer Station, Warehousing and Trucking." The application did not mention that LGI proposed to operate a solid waste or trash transfer facility. A certificate of occupancy was issued on July 14, 1994, for "Shipping, Freight & Cargo, Transfer Station, Warehouse and Trucking (Not sexually oriented)."

On December 18, 1995, the District enacted Act 11–177, the Solid Waste Facility Permit Act of 1995, which became effective February 27, 1996. *See* D.C.Code § 6–3451 *et seq.* (1996 Supp.). LGI filed suit on January 19, 1996, challenging as unconstitutional and otherwise illegal the laws and regulations establishing the solid waste permit program and the fees applicable to solid waste transfer stations.[2] In

---

1. On April 23, 1998, LGI changed its name to USA Waste of DC, Inc. For the sake of simplicity, we use the name LGI to refer to the company both before and after the name change.

2. LGI's verified complaint asserted the following sequence of events. The District passed several pieces of emergency legislation relating to solid waste disposal in 1994 and 1995. First, it passed the Recycling Fee and

its answer, filed March 22, 1996, the District denied LGI's assertion that it was licensed by the District to operate a solid waste and recyclable material transfer facility, and included a counterclaim requesting a declaratory judgment that LGI's certificate of occupancy did not permit it to operate a trash transfer facility. LGI answered the District's counterclaim on April 15, 1996. A scheduling order entered on April 19, 1996, placed the case on a pretrial track which allowed for discovery to take place over the summer.

Pursuant to the Act and its implementing regulations, LGI filed an application for a solid waste facility permit on June 9, 1996. On July 16, 1996, LGI filed a consent motion for leave to transfer the case to a slower litigation track. LGI stated in the motion that it expected to receive an interim permit, and that it expected the District to issue final regulations shortly, and suggested that the discovery period should be extended beyond those events. The motions court granted the motion, thus extending the discovery period until October. LGI served several written discovery requests on the District over the summer. On August 2, 1996, DCRA issued LGI a Solid Waste Handling Facility Interim Permit, subject to LGI's applying within thirty days for a certificate of occupancy describing the use of the facility as a solid waste handling facility. On September 3, 1996, LGI filed such an application under protest, claiming that it should not be required to apply for a certificate of occupancy because it already held a valid certificate of occupancy. DCRA's Building Land Regulations Administration (BLRA) denied the application because it would require a special exception under the zoning regulations, which only the Board of Zoning Adjustment (BZA) could grant. On February 21, 1997, LGI filed an appeal with the BZA, asserting, *inter alia*, that "LGI is operating lawfully by right under a valid CO at its existing facility and that CO has never been found invalid." LGI therefore asked the BZA to "declare that LGI's existing solid waste transfer station is grandfathered from any and all requirements" that "might [be] adopt[ed] pursuant to its pending special exception case."

On October 2, 1996, LGI filed motions in the Superior Court action for partial summary judgment and for a preliminary injunction; both pleadings addressed the $4 per ton tipping fee imposed by the Act. On December 19, 1996, the motions court granted another consent motion to modify the scheduling order, calling for discovery to continue into February 1997. In a status report to the court, the District listed, as a significant issue, "Whether LG has a valid certificate of occupancy to operate a solid waste facility." The District also noted that "The parties are in the intermediate stage of discovery." In response, the

Illegal Dumping Emergency Enforcement Act of 1994, the Solid Waste Facility Permit Emergency Act of 1994, and the Solid Waste Facility Permit Temporary Act of 1994. The third of these ("the 1994 Temporary Act") requires private solid waste facilities to obtain a solid waste facility permit, to pay a non-refundable $15,000 permit application fee, and pay a $10/ton annual capacity tax. The Act also "authorizes the Mayor to order immediate closure of any private transfer facility which the Mayor deems to be in violation of the interim permit or any health, safety, environmental or zoning law or regulation." The District issued implementing regulations in 1995 through emergency rulemaking without notice or comment. LGI submitted a permit application by the stated deadline of June 30,

1995, and was subsequently notified that its application was incomplete. LGI submitted a revised application on July 31, 1995, and in its complaint stated that it was unaware of any action that had been taken on the application, whether issuance of an interim or final permit or denial of the application.

Later, in 1995, the District enacted the Solid Waste Facility Permit Emergency Act of 1995, which implemented the same permit requirement and application fee as the prior laws, along with a $4/ton annual facility fee ("tipping fee"). This Act gives the Mayor the same power to close a non-conforming facility. Pending at the time of the complaint were the Solid Waste Facility Permit Temporary Act of 1995 and the Solid Waste Facility Permit Act of 1995.

court extended discovery until April 24, 1997.

The motions court denied LGI's motions for partial summary judgment and for preliminary judgment on April 23, 1997.[3] On April 29, 1997, the case was certified to the Civil I calendar. In a status report filed on May 22, 1997, LGI stated, "Based upon its counterclaim, LGI believes the District intends to submit the following legal issues: (a) Whether LGI possesses an appropriate certificate of occupancy to operate a transfer station...." On May 15, 1997, following the denial of LGI's motion for preliminary injunction, the District sent LGI a letter demanding payment for the solid waste facility charge due under the Act. On June 9, LGI filed a second motion to enjoin the District from enforcing this demand for payment.

On October 24, 1997, LGI filed a verified first amended complaint. In its motion for leave to file the amended complaint, LGI stated, "By the amended complaint, LGI ... seeks to narrow to one its causes of action in order to focus on the critical issue in this case, which is the constitutionality, legality and enforceability of the $4 per ton fee." LGI served additional discovery requests on the District on October 29, 1997.

On May 4, 1998, this case was consolidated with a second action LGI had filed on January 21, 1997, challenging final regulations issued by DCRA relating to the regulation of operators of solid waste transfer stations. In a status report filed pursuant to the consolidation order, LGI listed as a significant legal issue "Whether plaintiff is operating under a valid Certificate of Occupancy." LGI also stated, "Little discovery has been done." In its status report, filed pursuant to the consolidation order, the District listed as a significant legal issue "Whether plaintiff has a valid certificate of occupancy to operate a solid waste facility." In the same pleading the District requested leave to file a late answer to the first amended complaint. Leave was granted at a status hearing

held on June 22, 1998. On July 24, 1998, the District answered the first amended complaint. However, the District's answer did not include a counterclaim.

## B. *Injunctive Relief*

On August 3, 1998, the District served LGI with eleven administrative notices of infraction charging LGI with operating its transfer station without a valid certificate of occupancy. LGI did not pay the fines ($500 for each citation), nor did it request a hearing. On August 13, 1998, LGI filed a motion for temporary restraining order and preliminary injunction, seeking to enjoin the defendants "from using the administrative process to close plaintiff's place of business on the ground that it does not hold a valid Certificate of Occupancy while that very issue is awaiting resolution by this Court." LGI noted that "[e]ach citation requires LG to admit or deny the offense within 15 days of service. Hence, the need for emergency action by this Court on or before August 18, 1998."

The trial judge issued a temporary restraining order on August 17, 1998. On September 21, 1998, following a hearing on the motion, the trial court issued an "Order Staying Administrative Proceedings." The court ordered "that defendants District of Columbia, Department of Public Works, and Department of Consumer and Regulatory Affairs, by and through their employees, agents or representatives, including any administrative law judges in the Office of Administrative Hearings or otherwise are hereby":

A. Enjoined and restrained from conducting any administrative, enforcement or criminal proceedings, making any findings of fact, and/or seeking or imposing any penalties, fines or other sanctions regarding the validity of the Certificate of Occupancy issued to LG Industries in June, 1994, for the operation of a business at 1140 Third Street, N.E.;

---

**3.** The trial court denied LGI's motion for reconsideration on June 19, 1997.

B. Enjoined and restrained from proceeding in any way on the 11 Notices of Infraction issued by DCRA against LG Industries, Nos. 028392, 028393, 028394, 028395, 028396, 028397, 028398, 028399, 028400, 033476 and 033477; and

C. Enjoined and restrained from issuing any new Notices of Infraction against plaintiff alleging that it is operating its transfer station at 1140 Third Street, N.E., without a valid Certificate of Occupancy. . . .

The court further ordered that the stay would remain in effect "while decision in this case is pending or until further order of the Court."

In a "Motion to Extend Stay of Administrative Proceedings" filed on February 11, 1999, LGI asserted that it had just received a letter from the District's Board of Zoning Adjustment instructing it to notify the District by February 15 whether LGI wished to pursue its appeal of the decision not to reissue LGI's certificate of occupancy. On March 15, 1999, the trial court ordered "that in clarification of the Court's Order of September 21, 1998, 'administrative or enforcement proceedings or sanctions regarding the validity of the 1994 Certificate of Occupancy' includes actions taken by the District as a result of the validity of Plaintiff's Interim Operation Permit; it is Further Ordered that Defendants are enjoined from invalidating Plaintiff's Interim Operation Permit as a result of the withdrawal of its variance application."

4. A non-jury trial on the merits was held in July 1999. The trial lasted four days, with over a dozen witnesses testifying and many exhibits introduced into evidence. The trial court has stayed decision in the case pending resolution of the instant appeals.

5. D.C.Code § 5–424 is titled "Board of Zoning Adjustment." Section 5–424(f) states, in pertinent part: "Appeals to the Board of Adjustment may be taken by any person aggrieved . . . by any decision of the Inspector of Buildings granting or refusing a building permit or granting or withholding a certificate of

The District filed a timely notice of appeal from both the September 21, 1998 order and the March 15, 1999 order.[4]

## II.

## DISCUSSION

■ On appeal, the District contends that the trial court did not have jurisdiction to issue the injunctive order staying the administrative proceedings or, if it had jurisdiction, it should have declined to exercise its jurisdiction under the doctrine of primary jurisdiction. Given the extraordinary nature of injunctive relief, and the particular restraint courts must exercise before enjoining administrative action, we agree with the District's position.

### A. *Primary Jurisdiction*

■ The Board of Zoning Adjustment (BZA) is charged with interpreting the District's zoning regulations pursuant to D.C.Code § 5–424(f).[5] *Concerned Citizens of Brentwood v. District of Columbia Bd. of Zoning Adjustment*, 634 A.2d 1234, 1242 (D.C.1993). *See also Brawner Bldg., Inc. v. Shehyn*, 143 U.S.App.D.C. 125, 442 F.2d 847, 853 (1971). Exclusive jurisdiction to review such decisions in contested cases is now vested in this court, pursuant to D.C.Code § 1–1510. *See Fair Care Found. v. District of Columbia Dep't of Ins. & Sec. Regulation*, 716 A.2d 987, 997 (D.C.1998). Interim relief, such as the preliminary injunction at issue here, is available through this court only through the All Writs Act, 28 U.S.C. § 1651 (1988).

occupancy." Section 5–424(g) states, in pertinent part:

Upon appeals the Board of Adjustment shall have the following powers: (1) To hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision, determination, or refusal made by the Inspector of Buildings or the Mayor of the District of Columbia or any other administrative officer or body in carrying out or enforcement of any regulation adopted pursuant to [the zoning laws]; (2) To hear and decide . . . requests for special exceptions. . . .

*See Capitol Hill Hosp. v. District of Columbia State Health Planning & Dev. Agency,* 600 A.2d 793, 799 (D.C.1991). However, the All Writs Act does not constitute a concurrent basis for original jurisdiction. *See Auburn Med. Ctr., Inc. v. Peters,* 953 F.Supp. 1518, 1524 (M.D.Ala. 1996); *Gullickson v. Southwest Airlines Pilots' Ass'n,* 931 F.Supp. 1534 (D.Utah 1995), *aff'd,* 87 F.3d 1176 (1996). It is designed to grant relief in extraordinary circumstances.

Appellees, however, cite to D.C.Code § 5–426 as the underlying basis for the Superior Court's jurisdiction in this case. That statute makes it unlawful to "use any building, structure, or land" without a required certificate of occupancy or other form of permit, and further provides, in part:

> The Corporation Counsel of the District of Columbia or any neighboring property owner or occupant who would be specially damaged by any such violation may, in addition to all other remedies provided by law, institute injunction, mandamus, or other appropriate action or proceeding to prevent such unlawful erection, construction, reconstruction, alteration, conversion, maintenance, or use, or to correct or abate such violation or to prevent the occupancy of such building, structure, or land.

Appellees point to the fact that in its counterclaim the District expressly challenged the validity of their certificate of occupancy. The District responds, however, that even if § 5–426 provides an arguable basis for the trial court's jurisdiction over that claim, the court should have required appellees to exhaust their administrative remedies in the BZA regarding the certificate of occupancy issue. *See Brawner, supra,* 143 U.S.App.D.C. at 135, 442 F.2d at 856, 857 ("A litigant entitled to permanent relief under the zoning regulations may be compelled to pursue his administrative remedies rather than . . . to seek an initial judicial determination" because "[s]ound discretion leads the court to await

the 'last word' of administrative expertise and perspective . . . before the court exercises its limited role of judicial review."). The District argues that § 5–426, providing relief "in addition to all other remedies provided by law," cannot by its terms be used to limit the other remedies provided by law—specifically, the administrative process authorized by § 5–424.

A review of the statutory provisions makes it clear that review of contested zoning determinations is vested in the BZA. Whereas § 5–424 provides an administrative process for an aggrieved person to appeal an agency decision, § 5–426 provides an avenue of court-ordered relief for the District of Columbia and neighboring property owners or occupants for "violations of the zoning regulations relating to building permits and certificates of occupancy." *President & Dir. of Georgetown College v. Diavatis,* 470 A.2d 1248, 1250 (D.C.1983).

"Under the doctrine of primary jurisdiction, when a claim is originally cognizable in the courts but requires resolution of an issue within the special competence of an administrative agency, the party must first resort to the agency before he or she may sue for an adjudication." *Drayton v. Poretsky Management, Inc.,* 462 A.2d 1115, 1118 (D.C.1983).

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the

special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Id.* (quoting *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 62–63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

■ Appellees assert that resolving the validity of their certificate of occupancy does not require the special expertise of the Board of Zoning Adjustment. We are not nearly as certain of that fact as are appellees. Whether LGI held a valid certificate of occupancy for the 1140 Third Street site since 1994 may turn upon not only the practices of the District's zoning administrators with regard to similar facilities, but an interpretation of "transfer station" within the framework of the zoning regulations. Review of such zoning matters has been "placed within [the] special competence of the BZA." *Id.* "BZA is charged with interpreting the zoning regulations," and the courts "must defer to the BZA's interpretation of those regulations, related to matters within its expertise, unless that interpretation is plainly wrong or inconsistent with the regulations or with the statute under which the BZA acts." *Concerned Citizens of Brentwood v. District of Columbia Bd. of Zoning Adjustment, supra,* 634 A.2d at 1242. Our cases have been uniform in requiring such matters to be decided by the administrative body charged with their resolution. *See, e.g., Harrington v. Moss,* 407 A.2d 658 (D.C.1979) (worker's compensation); *Drayton, supra* (rent increases); *Vargo v. Barry,* 667 A.2d 98 (D.C.1995) (negligent treatment at Police and Firefighters Clinic). Far from enjoining the continuation of proceedings before the BZA, the trial court should have awaited the BZA's resolution of the certificate of occupancy issue.

## B. *The District's Counterclaim*

Appellees contend, however, that the District may not invoke the doctrine of primary jurisdiction because it was the District that initially invoked the jurisdiction of the court with regard to this issue, when it filed a counterclaim seeking a declaratory judgment concerning the validity of appellees' certificate of occupancy. Appellees rely upon a federal decision which rejected a primary jurisdiction argument in a breach of contract case involving a shipping act and anti-trust laws, stating that one consideration which made exclusive primary jurisdiction inapplicable was "that the doctrine is invoked by the [party] who sought this judicial forum...." *River Plate and Brasil Conferences, Inc. v. Pressed Steel Car Co.,* 124 F.Supp. 88 (S.D.N.Y.), *aff'd,* 227 F.2d 60 (2d Cir.1955).

■ The forum selection of the parties, however, is not dispositive. In *United States v. Western Pacific Railroad Co., supra,* 352 U.S. at 59, 77 S.Ct. 161, the Supreme Court reversed a Court of Claims ruling on the issue of primary jurisdiction, although neither party had contested that aspect of the case. In refusing to distinguish between considerations of "tariff construction" and "reasonableness" in applying the doctrine of primary jurisdiction, the Court stated, "the mere fact that the issue is phrased in one instance as a matter of tariff construction and in the other as a matter of reasonableness should not be determinative on the jurisdictional issue. To hold otherwise would make the doctrine of primary jurisdiction an abstraction to be called into operation at the whim of the pleader." *Id.* at 69, 77 S.Ct. 161. Similarly, in *Brawner, supra,* the court required a plaintiff, who had invoked the court's jurisdiction, to pursue administrative remedies before resorting to the courts for relief. Here, too, the doctrine should be applied notwithstanding the litigation maneuvers of the parties. The advantages of such deference to the body with primary expertise are too important to be laid aside.

Appellees' ultimate argument is that the District abused the judicial process by waiting until litigation was well underway before invoking the administrative process

for tactical reasons, apparently deciding then that it would fare better in the administrative forum. This position, however, is belied by the record. At the time appellees filed their motion for stay of administrative proceedings, the record reflects that the parties were still preparing their respective cases. As appellees noted in a motion, "[t]he parties are *poised to begin discovery* in preparation for the discovery deadline" (emphasis added). Indeed, LGI has also represented that "[l]ittle discovery has been done." In a further acknowledgment that the bulk of the litigation was still ahead of them, appellees stated that "the District's administrative action will unfairly force plaintiff to defend the identical issue in two forums." Thus, the record does not support a conclusion that we should decline to apply the doctrine of primary jurisdiction in this case based on the District's having acted in less than good faith.

■ In *District of Columbia v. Group Ins. Admin.*, 633 A.2d 2 (D.C.1993), this court reiterated the "extraordinary" nature of the injunctive remedy, and admonished that "[t]he trial court must be especially careful [before resorting to that remedy] where ... the requested relief

would enjoin agency action pending the outcome of administrative review." *Id.* at 21. In part the reason for this restraint is the very one that underlies the primary jurisdiction doctrine, which is that the court "is acting"—and risks disruption—"in a field that is normally confided to the agency's expertise." *Id.* The teaching of that case applies here as well.

Accordingly, we conclude that the trial court erred in exercising jurisdiction over the question of the validity of appellees' certificate of occupancy and in enjoining the appropriate administrative agencies from doing so.[6]

*Reversed.*

---

**6.** The District also contends that the trial court did not have jurisdiction to issue a preliminary injunction because the District's counterclaim, in which it raised the issue of appellees' certificate of occupancy, had no legal force. This argument is premised on the fact that the District filed an amended answer, in response to appellees' amended complaint, and the amended answer did not include a counterclaim. Although we need not reach this issue, we note that it has some support in case law. *See Goldstone v. Payne,* 94 F.2d 855, 856 (2d Cir.) (stating that amended answer which lacked affirmative prayer took out of pleadings any prayer by defendant for affirmative judgment), *cert. denied,* 304 U.S. 585, 58 S.Ct. 1057, 82 L.Ed. 1547 (1938). *Compare Louis Lyster Gen. Contr., Inc. v. City of Las Vegas,* 83 N.M. 138, 489 P.2d 646, 657 (N.M.1971) (concluding that counterclaim survived where amended answer made clear recovery was sought on counterclaim). Although a counterclaim is a separate "claim for relief," *see* Super. Ct. Civ. R. 8(a), it is not a separate pleading, *see*

Super. Ct. Civ. R. 7(a). Thus, a counterclaim and an answer form a single pleading. *See id.* "An amended pleading ordinarily supersedes the prior pleading. The prior pleading is in effect withdrawn as to all matters not restated in the amended pleading, and becomes functus officio." *Nisbet v. Van Tuyl,* 224 F.2d 66, 71 (7 th Cir.1955) (citing 71 C.J.S, Pleading § 321, p. 717).

Appellees contend that pursuant to Rule 41, which governs dismissal of actions, including counterclaims, the District could not have voluntarily dismissed its counterclaim without leave of the court unless it had obtained the consent of appellees. However, when the trial court granted appellees leave to file an amended complaint it was effectively allowing the parties to reframe the issues in the case. This was especially true here, where appellees' Motion for Leave to File Amended Complaint stated, "By the amended complaint, LGI also seeks to narrow to one its causes of action in order to focus on the critical issue in this case...."