**Jeff GULLICKSON, Thomas A. Mosher, Charles M. Motz, Jr., Michael Pratt, Gerald Puckett, Gary Joseph Sallee, Gary Winn, Individually, and as representatives of a class of all Morris Air Pilots; Corey Holberg and Robert R. May, II., Plaintiffs–Appellants,**

v.

**SOUTHWEST AIRLINES PILOTS' ASSOCIATION, Southwest Airlines Company and Morris Air Corporation, Defendants–Appellees.**

No. 95–4155.

United States Court of Appeals, Tenth Circuit.

July 2, 1996.

Rehearing Denied Sept. 6, 1996.

Daniel M. Katz (Louise P. Zanar with him, on the brief), Katz & Ranzman, P.C., Washington, D.C., for Plaintiffs–Appellants.

J. Joe Harris, Matthews & Branscomb, San Antonio, TX, and Marvin Menaker, Dallas, TX, for Defendants–Appellees.

Before HENRY, MURPHY, and LIVELY *, Circuit Judges.

MURPHY, Circuit Judge.

After careful review of the record, we adopt the analysis of the district court's Memorandum Decision and Order Denying Plaintiffs' Motion for Partial Summary Judgment, Granting in Part Defendants' Motions for Summary Judgment, and Denying Plaintiffs' Motion for Class Certification. We therefore **AFFIRM** for substantially the reasons given by the district court and **ORDER** the district court's memorandum decision and order to be published.

### ATTACHMENT

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

Jeff Gullickson, et al., Plaintiffs,

v.

Southwest Airlines Pilots' Association, Southwest Airlines Company, and Morris Air Corporation, Defendants.

MEMORANDUM DECISION AND OR-DER DENYING PLAINTIFFS' MO-TION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND DE-NYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Civil No. 94–C–660W

WINDER, Chief Judge.

### I. *INTRODUCTION*

This matter is before the court on three separate motions for summary judgment: (1)

plaintiffs Jeff Gullickson, Thomas A. Mosher, Charles M. Motz, Jr., Michael Pratt, Gerald Puckett, Gary Joseph Sallee, Gary Winn, Robert R. May II, and Corey Holberg's ("Plaintiffs") motion for partial summary judgment[1] as to liability on claims one, two, and three of the second amended complaint ("Complaint");[2] (2) defendant Southwest Airlines Pilots' Association's ("SWAPA") motion for summary judgment on claims one, two, and three of the Complaint, and (3) defendants Southwest Airlines Company's ("Southwest") and Morris Air Corporation's ("Morris") motion for summary judgment on claims one and four[3] of the Complaint. A hearing on these motions was held July 19, 1995. Daniel M. Katz represented Plaintiffs. J. Joe Harris and David A. Anderson represented Southwest and Morris. SWAPA was represented by Marvin Menaker and Arthur F. Sandack. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to the various motions. Now being fully advised, the court enters the following memorandum decision and order.

### II. *BACKGROUND*

In December of 1992, defendant Morris Air Corporation began operations after obtaining a Part 121 operating certificate.[4] *See* Memorandum From SWAPA to SWAPA Members at p. 1 (Dec. 22, 1993) [hereinafter December 22 Memo.] (attached as Exhibit 1

---

* Of the Sixth Circuit Court of Appeals, sitting by designation.

1. Plaintiffs have apparently moved for summary judgment against only SWAPA and Southwest. Their briefs make no mention of Morris.

2. Plaintiffs' Complaint states four claims against three defendants: (1) breach of the duty of fair representation ("DFR") under the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.* (SWAPA, Southwest, Morris), (2) violations of the SWAPA

constitution and bylaws (SWAPA), (3) denial of equal rights and privileges pursuant to the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401, *et seq.* (SWAPA), and (4) wrongful termination of plaintiff Michael Pratt ("Pratt") (Southwest).

3. Claim number four is asserted only against Southwest.

4. Morris had operated as a charter service since 1984, booking charters on nonscheduled airlines

to Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment, Case No. 94–C–660W (Mar. 13, 1995) [hereinafter Plaintiffs' Summary Judgment Memo.]). One year later, Morris decided to sell its operations. The result of that decision was that on December 31, 1993, defendant Southwest acquired all Morris stock in exchange for 3.6 million newly issued shares of Southwest's common stock. At the time of the sale Morris employed 202 pilots and Southwest employed 1487 pilots. It is undisputed that Morris was sold without labor protective agreements, that Morris pilots were not under contract, and that Morris pilots had no agreements with Morris to protect their seniority.

On about December 10, 1993, SWAPA learned of the pending takeover of Morris by Southwest. *See* Declaration of Gary Kerans at ¶ 3 [hereinafter Kerans Dec.] (attached as Exhibit 2 to Southwest Airlines Pilots' Association's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Case No. 94–C–660W (May 4, 1995) [hereinafter SWAPA's Response]). At that time, Southwest requested "prompt negotiations for an amendment to the collective bargaining agreement" with SWAPA ("SWAPA–Southwest CBA"). *Id.* In particular, Southwest sought a waiver of the scope agreement provisions in the SWAPA–Southwest CBA.[5]

Morris pilots were not members of SWAPA in December of 1993 and January of 1994. *See* Oral Deposition of Thomas Mosher at p. 54 (Jan. 31, 1995) [hereinafter Mosher Depo.] (attached as Exhibit B to Appendix of Summary Judgment Evidence of Southwest's and Morris' Motion for Summary Judgment, Case No. 94–C–660W (May 8, 1995)). Nevertheless, prior to engaging in the requested negotiations with Southwest, SWAPA wished to meet with a representative group of Morris pilots. *See* Kerans Dec. at ¶ 4. Consequently, in mid-December of 1993, a group comprised of several Morris pilots—Ray Plummer, David Wabel, Chip Beedle, Tim Murphy, and plaintiff Thomas A. Mosher ("Mosher") (collectively "Morris Committee")—was formed[6] to represent the interests of Morris pilots as they related to the acquisition. Shortly thereafter, on December 16, 1993, the Morris Committee met with representatives from SWAPA[7] ("SWAPA Committee") for more than eight hours in Salt Lake City to discuss issues related to the Morris pilots and the acquisition.[8] At the meeting, the SWAPA Committee informed the Morris Committee that they wanted to know their concerns and priorities, and stated that they would address those as best they could. *See* Mosher Depo. at p. 42. Pursuant to this request, the Morris Committee presented the SWAPA Committee with a previously-prepared, prioritized list entitled

---

through its Morris travel agency. *See* December 22 Memo. at p. 1.

5. The scope provisions are contained in Section I.A of the SWAPA–Southwest CBA. These provisions state:

The Company hereby recognizes the Association as the sole collective bargaining representative of the Airline Pilots and Flight Engineers of the Company. For purposes of this Agreement, "Company" shall include Southwest Airlines Co., and any subsidiary company, and any wholly owned or partially owned and controlled company engaged in transporting passengers by air.

6. The parties disagree as to how this committee was formed. According to plaintiff Thomas Mosher ("Mosher"), however, a letter was posted on the bulletin board inviting all Morris pilots to

attend a meeting to discuss the acquisition. *See* Mosher Depo. at p. 12. Although Mosher claims that the Morris Committee was "self-appointed," he also concedes that there was a "general consensus" among the pilots at the meeting that the proposed membership of the Morris Committee was satisfactory. *See id.* at pp. 13–14.

7. The members of the SWAPA Committee were Gary Kerans, Len Legge, Steve Palmason, John Schnobrich, and Paul Emens. *See* Mosher Depo. at p. 21. Mosher felt that this group represented the top people from SWAPA—those with authority to act for SWAPA.

8. Mosher states that members of the Morris Committee met several times prior to the December 16 meeting to determine the concerns of the Morris pilots. *See* Mosher Depo. at pp. 16–18.

"Job Security Issues"[9] which enumerated seven issues which they wished to see addressed.[10]

It is undisputed that the Morris Committee's number one goal was guaranteed employment at Southwest for all Morris pilots.[11] *Id.* at p. 34. Regarding the December 16 meeting and the Morris Committee, the SWAPA Committee stated that its members "were professional, knowledgeable, and were consistent in putting the needs of their pilot group ahead of their own concerns. While discussions occasionally became heated, the maturity and experience of this group made it possible to transact business under an almost impossible set of time constraints." *See* December 22 Memo. at p. 4.

After the December 16 meeting, SWAPA representatives met with Southwest.[12] The

9. Those issues were:
   1. Guaranteed pilot employment for all Morris Air pilots at Southwest Airlines.
   2. No pre-employment interviews or tests as a condition of employment.
   3. Full recognition of Sierra/Morris, Ryan/Morris, and Morris Air length of service toward probationary status.
   4. No loss of pay or benefits.
   5. Seniority position for all Morris Air pilots on the Southwest Air Pilot Seniority List.
   6. A need to address 27 Morris Air pilots who may need a B737 type rating. These pilots have considerable experience in the B737 right seat.
   7. A need to address a small number of Morris Air pilots that don't have 1000 hrs. PIC turbine.

10. Plaintiffs contend that the Morris Committee had also prepared a list containing these issues: (1) seat protection, (2) domicile protection, (3) seniority arbitration, (4) Morris Air fence, (5) Morris pilot migration from fence to Southwest, (6) pay for seniority position, and (7) length of service for Morris pilots. *See* Plaintiffs' Summary Judgment Memo. at p. 7 (referring to "Confidential Issues" list). This list was never presented to the SWAPA Committee. *Id.* at p. 24.

   Plaintiffs state that the Confidential Issues list was not presented because "SWAPA representatives threatened to stop the meeting and adamantly refused to discuss or consider such issues." *Id.* at p. 7 (citing Mosher Depo.); *see also* Supplemental Declaration of Darvin (Chip) E. Beedle at ¶ 2 (June 14, 1995) [hereinafter Supplemental Beedle Dec.] (stating "SWAPA committee refused to discuss issues of seniority integration and seat protection" at December 16 meeting).

   Defendants, however, present two contrary statements. First, John Schnobrich, SWAPA Committee member, testified that:

   [ ] In the meeting of the two committees on December 16, 1993, I did tell the committee that I was not willing to place the seniority concerns of the Morris pilots ahead of the concerns of the SWAPA pilots. We had a very frank discussion and the Morris Air pilots committee did not indicate any unwillingness to discuss all the issues with our committee.

   [ ] The [Job Security Issues list] was the only written listing of issues every [sic] presented to the SWAPA committee. The Morris pilots could have presented us any additional written issues they chose to present, although we would not necessarily agree with them.

   *See* Declaration of John Schnobrich at ¶¶ 5–6 (Mar. 28, 1995) [hereinafter Schnobrich Dec.] (attached as Exhibit 3 to SWAPA's Response).

   Second, Gary Kerans testified that:

   The SWAPA committee listened to all of [the Morris Committee's] needs and desires and asked them to prioritize them. Later in the evening they did that and handed us a list. They never handed us any other written material, although they were free to do so at anytime. We may or may not have agreed with any of the items, but we wanted full input from the Morris committee, and told them so.

   *See* Kerans Dec. at ¶ 5.

   The Morris Committee also presented the SWAPA Committee with a third "sheet of paper" summarizing their "concerns of the merger." *See* Mosher Depo. at pp. 18–19, 23 (mentioning "Merger and Status Issues" summary).

11. The Morris Committee anticipated that it would "get" all of the things included in the three documents (Job Security Issues list, Confidential Issues list, Merger and Status Issues summary). *See* Mosher Depo. at p. 20. However, it is also conceded that the Morris Committee had "no force of any kind, or no legitimacy of any kind," and that they had no way of forcing SWAPA to do anything. *Id.*

12. Morris Committee member Chip Beedle ("Beedle") states that on numerous occasions the SWAPA Committee refused his requests for permission to attend negotiations between SWAPA and Southwest. *See* Supplemental Beedle Dec. at ¶ 3.

   However, Beedle also states that during the negotiations:

   there were many calls between SWAPA and members of the Morris Air committee in which SWAPA asked the committee's input to the negotiations that were ongoing between SWAPA and Southwest. There were discussions of the particular resistance of the Company on some issues. Our committee was asked to refine issues and they were expressly asked for their position. For example, our committee wanted the pilots not to have any probationary

result of those meetings was the Letter of Agreement, which contains a scope waiver clause [13] as well as the seniority provisions about which Plaintiffs now complain.

SWAPA sent all of its members a copy of the December 22 Memorandum and an unexecuted copy of the Letter of Agreement. *See* Plaintiffs' Summary Judgment Memo. at p. 8. This memorandum provided "questions and answers concerning the acquisition of Morris Air and the Letter of Agreement." *Id.* Included among the numerous questions posed and answered in the December 22 Memorandum were: (1) "Who did SWAPA deal with from the Morris Air pilots?" (2) "What were the major concerns of the Morris pilots?" [14] (3) "How did the Company propose to '. . . offer employment to a great majority of [Morris'] permanent employees?'" [15] (4) "Why are the Morris pilots not moved into the Southwest Airlines pilots seniority list ahead of some existing Southwest pilots based on past service/seniority at Morris?" and (5) "Where will the Morris Air pilots fit in on the Southwest Airlines pilots seniority list?" This last question was answered:

All 202 Morris pilots will go on the Southwest Airline pilot seniority list as of January 1, 1994, as though they were one large class of new hires. They will go on the list in order of seniority on the Morris list, and all pilots hired later at Southwest or Morris will go on the list by date of hire. *See* December 22 Memo. at p. 5. This explanation correctly states the terms of the Letter of Agreement.

On December 22, 1993, the SWAPA Committee also briefed the Morris Committee in person as to the provisions of the tentative Letter of Agreement. In addition, on both December 22, 1993 and December 23, 1993, the SWAPA Committee held informational meetings in Salt Lake City. These meetings were advertised by bulletin, all Morris pilots were invited to attend, and the meetings were not restricted in any way. *See* Mosher Depo. at p. 49. Plaintiffs do not dispute that, at those meetings, the SWAPA Committee went over the entire tentative Letter of Agreement item by item and answered all questions from the floor. As plaintiff Mosher explained, "[i]t was a road show to explain the tenets of the agreement between Southwest and SWAPA." *Id.* at p. 50. In fact,

---

period, and they did not want any interviews before becoming Southwest pilots. The SWAPA committee reported to us that the company position was that they were not required to take every pilot and that everybody they did take was to take a full one–year probationary period. The Morris Air committee was aware that the other groupings of Morris employees were not hired in mass. At one point, SWAPA asked our committee's view on an alternative position that the Company indicated they might accept. That position was that probation would only be six months instead of twelve, but there would be an interview to Southwest's satisfaction before the pilots would receive the pilot's job with Southwest. Our committee talked it over and advised the SWAPA committee that we preferred the full probation without the interview. That is ultimately what was included in the Letter of Agreement.

Declaration of Darvin (Chip) E. Beedle at ¶ 9 (Apr. 25, 1995) [hereinafter First Beedle Dec.] (attached as Exhibit 5 to SWAPA's Response); *see also* Mosher Depo. at p. 46 (stating SWAPA communicated with Morris Committee regarding probation issue).

13. The Letter of Agreement "provides for waiver of the application of the quoted recognition pro-

visions until May 31, 1996." *See* Plaintiffs' Summary Judgment Memo. at p. 4.

14. The major concerns were listed as:

A. Guaranteed employment at Southwest.
B. No selection or pre–employment screening.
C. Credit for probation served at Morris toward Southwest probation.
D. No loss of pay or benefits.
E. Insuring a fair position for Morris pilots on the Southwest seniority list.
F. Protecting Morris pilots who do not meet type rating or turbine PIC requirements.

15. The answer given was:

The company initially proposed that each group of Morris pilots coming over during the next two years be interviewed and screened for employment at that time. Those selected would be added to new hire classes, with seniority and pay from that date. Those not selected would be terminated. That would have created a situation where those pilots who worked to run the subsidiary for the next two years, would face two years of uncertainty over future employment, and, if selected, would lose up to two years pay longevity and seniority while taking a pay cut.

Mosher attended one of the meetings primarily to answer questions about the Letter of Agreement, whose terms he was already familiar with. *Id.* at p. 74. Mosher also agrees that by the conclusion of the meetings, the Morris pilots would have known that they were not getting seat protection, and that they were not going to be captains.[16] *See id.* at p. 52. Regarding the general tenor of the meetings, Morris Committee member Chip Beedle stated:

[ ] When SWAPA presented the tentative Letter of Agreement at the meetings, they were well received. In one meeting of approximately 50 Morris Air pilots, it resulted in a standing ovation for the SWAPA committee. There were no harsh questions from the floor. There were no questions about seniority directed at the SWAPA committee.

[ ] The SWAPA committee then explained the process whereby this tentative agreement would be ratified by SWAPA members (not Morris pilots) and explained the voting process to them. Nobody in the meeting asked for the right to vote about it. Copies of the Letter of Agreement were passed out.

[ ] While SWAPA did not get all of the seven items on the list that the Morris committee gave them, they did achieve more than half of them. They did negotiate a job for each Morris Air pilot, which was [the] most important item to the Morris Air pilots. Nobody was left out of a job, regardless of their lack of a 737 type rating, their medical status, or their prior work history with Southwest.

Beedle Dec. at ¶¶ 11–13; *see also* Schnobrich Dec. at ¶¶ 11–12 (noting no objection to any part of Letter of Agreement and no questions or comments about seniority or seat protection); Mosher Depo. at pp. 53–54 (stating that none of the Morris pilots were SWAPA members in December of 1993 and January of 1994, and neither he nor Morris Committee asked to vote on Letter of Agreement).

Plaintiffs acknowledge that "[b]y memorandum dated … December 23, 1993,[17] the SWAPA president transmitted the December 22 Memorandum with a copy of the Letter of Agreement to the Morris Air pilots." Plaintiffs' Summary Judgment Memo. at p. 14. It is also undisputed that "[a]fter the December 23, 1993, meeting with the Morris Air Pilots, SWAPA left behind extra copies of the Letter of Agreement for Morris Air Pilots and placed a copy in each Morris Air Pilots' box." *See* Southwest Airlines Pilots' Association's Memorandum in Support of Summary Judgment Motion at p. 3, Case No. 94–C–660W (May 4, 1995) [hereinafter SWAPA's Summary Judgment Memo.]. Furthermore, Plaintiffs were aware that the Letter of Agreement "included amendments to the SWAPA/Southwest collective bargaining agreement."[18] *See* Plaintiff's Memorandum

---

**16.** Although Mosher attended one of the meetings, he states that he was tired, was "not really listening," and therefore cannot remember whether SWAPA went through each item in the Letter of Agreement. *See* Mosher Depo. at p. 50. Nor can he remember whether any Morris pilots raised the issues of seniority or seat protection, although he does agree that copies of the Letter of Agreement were left for the Morris pilots, and that he never personally witnessed anyone objecting "behind the scenes." *Id.* at pp. 50–52.

**17.** This memorandum is addressed to "All Morris Air Pilots" from "Gary Kerans, President SWAPA." *See* Memorandum (Dec. 23, 1993) (attached as Exhibit 2 to Plaintiffs' Summary Judgment Memo.). The subject is "Morris Air Acquisition Letter of Agreement." The memorandum states in part:

We have enclosed support information to help explain the details of the agreement that is currently out for a ratification ballot before the SWAPA membership. Ratification by our membership is required per our constitution. The official results will be determined on Friday, January 7, 1994 and will be immediately forwarded.

. . .

I am enclosing a copy of the agreement between SWAPA and Southwest Airlines on the Morris Air acquisition as well as a copy of a question and answer sheet which was sent to all SWAPA Members. Hopefully, these documents will answer your questions. If additional questions arise, please forward them through your representative and we will get your answer.

**18.** Plaintiffs contend that the Letter of Agreement also "includes provisions governing the terms and conditions of the Morris Air pilots while they remain employed by Morris Air." *See* Plaintiffs' Opposition Memo. at p. 5.

in Opposition to Defendants' Summary Judgment Motions at p. 5, Case No. 94–C–660W (June 19, 1995) [hereinafter Plaintiffs' Opposition Memo.].

On January 7, 1994, the members of SWAPA ratified the tentative Letter of Agreement, which was retroactively effective to January 1, 1994.[19] Plaintiffs were aware of the ratification.[20] *See* Plaintiffs' Summary Judgment Memo. at p. 9.

In February of 1994, SWAPA became the collective bargaining agent for the Morris pilots. Three months later, on May 16, 1994, Morris pilots ratified a collective bargaining agreement that had been negotiated between SWAPA and Morris ("SWAPA–Morris CBA") by a vote of 134 to 2.[21] In relevant part, the SWAPA–Morris CBA[22] states:

> The *parties to this agreement recognize* that the Company is a wholly owned subsidiary of Southwest Airlines Co. The Company is winding down operation and will complete the transfer of assets and flight operations to Southwest Airlines not later than May 31, 1995. *Morris Air pilots will be transferred to the parent in accordance with the terms of an agreement between Southwest Airlines and the Association dated January 1, 1994 concerning the acquisition of Morris Air .... Upon transfer to Southwest Airlines, Morris Air pilots will become part of the pilot bargaining unit at Southwest Airlines and will be governed by the collective bargaining agreement between the Association and Southwest Airlines ....*

*See* SWAPA–Morris CBA at pp. 1–2 (emphasis added).

Morris pilots Ray Plummer and Frank Anthony were among those who participated in the negotiation of the SWAPA–Morris CBA. *See* Declaration of Frank E. Anthony at ¶ 5 (Apr. 12, 1995) (attached as Exhibit 4 to SWAPA's Response Memo.). In addition, after SWAPA negotiators reached a tentative agreement with Morris, two meetings were held with the Morris pilots to explain the proposed contract. *Id.* Plaintiffs apparently do not dispute that all sections of the contract were explained at the meeting, nor that Steve Palmason explained the section at issue here. *See* Plaintiffs' Opposition Memo. at p. 10, n.7. Further, copies of the proposed SWAPA–Morris CBA were made available to the entire pilot group. *See* Mosher Depo. at p. 57. The results of the ratification vote were announced on May 16, 1994.

On June 29, 1994, Plaintiffs filed this suit. Two days later, on July 1, 1994, Southwest terminated plaintiff Michael Pratt's ("Pratt") employment as a pilot.

Plaintiffs now move for partial summary judgment on claims one, two, and three of the Complaint, asserting the following basic arguments: (1) SWAPA's DFR was breached by the "endtailing"[23] of Morris pilots, and (2)

---

**19.** Regarding the SWAPA constitution: (1) Art. III, sec. 1(A) accords membership to those represented by SWAPA provided they have completed their probationary period, (2) Art. III, sec. 1(G) provides that only members may vote in SWAPA elections, ratifications, or other business affecting SWAPA or its members, (3) Art. IX(B) provides for ratification of collective bargaining agreements by two–thirds approval of the Board of Directors and then a majority vote of the membership, and (4) Art. IX(D) provides that collective bargaining agreements may only be ratified by members in the bargaining unit covered by the agreement.

**20.** Copies of the SWAPA–Southwest CBA and the SWAPA constitution were made available to the Morris Committee prior to ratification of the Letter of Agreement. *See* Mosher Depo. at p. 59.

**21.** Of the 178 ballots mailed for the election, 145 were returned, of which 7 were found invalid. Of the 138 valid ballots, 134 approved the contract, 2 disapproved, and 2 abstained. Mosher cast one of the disapproving votes. *See* Mosher Depo. at p. 56.

**22.** The parties have not provided the court with a complete copy of the SWAPA–Morris CBA.

**23.** Defendants contend that the term "endtailing" is not completely accurate, since all Morris pilots received a January 1, 1994 seniority date and Southwest seniority began accruing from that date even though the pilots continued to fly for Morris for varying periods after the merger. Consequently, as Morris pilots were later transferred to Southwest, they occupied a better position on the seniority list than pilots hired by Southwest after January 1, 1994.

The court expresses no opinion as to the appropriateness of this term.

SWAPA unlawfully denied the Morris pilots an opportunity to ratify the Letter of Agreement.

SWAPA moves for summary judgment on claims one, two, and three on the following grounds: (1) the statute of limitations bars claims one, two, and three, (2) Plaintiffs could not vote on the Letter of Agreement because they were not members of SWAPA or eligible for membership at material times (claims two and three), and (3) by ratifying the SWAPA–Morris CBA, Morris pilots ratified SWAPA's actions as a whole (claims one, two, and three).

Morris and Southwest move for summary judgment on claims one and four, [24] asserting that: (1) SWAPA fulfilled its DFR, (2) the Letter of Agreement was ratified by Morris pilots when they ratified the SWAPA–Morris CBA, (3) claim one is barred by the statute of limitations, and (4) claim four fails to state a claim upon which relief can be granted.

### III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir.1991).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . .

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casulty Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991).[25] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.), *cert. denied*, 502 U.S. 827, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[26] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

### IV. DISCUSSION

#### A. First, Second, and Third Causes of Action

Legal authority holds, and Plaintiffs apparently concede,[27] that ratification of a seniority arrangement is a valid defense to complaints about a union's actions in making that arrangement. *See, e.g., Rakestraw v. United Airlines Inc.*, 981 F.2d 1524 (7th Cir.1992), *reh'g denied*, 989 F.2d 944, *cert. denied sub nom. Hammond v. Air Line Pilots Ass'n, Int'l*, —— U.S. ——, 114 S.Ct. 175, 126 L.Ed.2d 134 (1993); *Marshall v. Local Union No. 6, Brewers & Maltsters and Gen. Labor Dep'ts*, 960 F.2d 1360 (8th Cir.1992);

---

**24.** Claim number four applies only to Southwest.

**25.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.

**26.** "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512.

**27.** At the July 19, 1995 hearing, Plaintiffs' counsel did not dispute the court's question/suggestion that if ratification occurred, "you'd be out of court."

*Papcin v. Dichello Distribs., Inc.*, 697 F.Supp. 73 (D.Conn.), aff'd, 862 F.2d 304 (2d Cir.1988).

For example, in *Rakestraw*, pilots of a small airline ("Ozark") acquired by a larger airline ("TWA") voted to approve an agreement which merged the seniority lists by date of hire, even though they knew that this would leave the TWA pilots with the "pick of the assignments." *See Rakestraw*, 981 F.2d at 1526–27. Concededly, the vote was made under duress, since delay caused by the TWA pilots' objections to Ozark's proposed "slotted" seniority system had caused TWA to announce that it would simply operate Ozark's planes with TWA's pilots. *Id.* at 1527. Thus, "[s]taring unemployment in the face, Ozark's pilots accepted a merger of the seniority lists by date of hire." *Id.* Later, a class of Ozark's former pilots sued the union for, among other things, violating its DFR.[28] *Id.* In its opinion, the court first pointed out the Ozark pilots' weak bargaining position and the uphill battle that the union faced in resolving conflicts between TWA, the TWA pilots, and the Ozark pilots.[29] *Id.* at 1533. In this regard, the court stated that even if the union had made a mistake of judgment, "a mistake of judgment does not violate the duty of fair representation." *Id.* More importantly, the court stated that "[a]ll of the Ozark pilots' remaining contentions, variously expressed in terms of the Railway Labor Act, the LMRDA, and the wraparound agreement, founder on their own vote in favor of the merger and the ensuing new collective bargaining agreement." *Id.*

A similar situation is found in *Marshall*, wherein a union was sued for a DFR breach due to its failure to negotiate a dovetailed seniority list for a group of yeast workers. *See Marshall*, 960 F.2d at 1362. The facts show that the yeast workers had been informed by their employer that they would lose their jobs when the plant where they worked was sold and/or closed. *Id.* Their union subsequently negotiated an agreement giving the yeast workers the right to be transferred to a brewery (also owned by the employer) with modified endtailing—although the union had originally suggested to the yeast workers that seniority would be dovetailed. In finding that the union had not breached its DFR, the court noted that the union used its best efforts to assist the yeast workers who would otherwise have been out of a job, and that the yeast workers themselves ratified the collective bargaining agreement that called for modified endtailing. *Id.* at 1370.

Plaintiffs' arguments against the ratification defense in the instant case are essentially that: (1) an "oblique" reference to "transfer" of pilots according to the terms of an earlier agreement could not incorporate the challenged seniority agreement into the SWAPA–Morris CBA, (2) Morris pilots were not informed by SWAPA that a vote in favor of the SWAPA–Morris CBA would also ratify their seniority endtailing as outlined in the Letter of Agreement, and (3) even a negative vote on the SWAPA–Morris CBA would not have given Morris pilots the right to reject the seniority integration. *See* Plaintiffs' Summary Judgment Memo. at pp. 27–28; Plaintiffs' Opposition Memo. at pp. 9–12.

These arguments are unpersuasive for several reasons. First, it appears to the court that Plaintiffs themselves recognized the interplay between the Letter of Agreement and the SWAPA–Morris CBA. Indeed, Plaintiffs' naming of Morris as a defendant appears to contradict their contention that an "oblique" reference to the terms of an earlier agreement did not incorporate the seniority terms of that agreement into the SWAPA–Morris CBA. Plaintiffs' Complaint describes the grounds for Morris' liability thusly:

> Southwest has participated in and facilitated SWAPA's breach of the duty of fair representation by, among other things, *succumbing to pressure from SWAPA to acquiesce in and enter into an agreement* which it knew devastated the seniority rights of the Morris Air pilots. *Morris*

28. The Ozark pilots' claims emphasized the union's departure from its usual merger policy and the union president's "toadying" to the TWA pilots, who had threatened to secede from the union unless the seniority list was merged by date of hire. *See Rakestraw*, 981 F.2d at 1527.

29. In its discussion, the court noted that "[c]ontentions that endtailing violates the union's duty [of fair representation] have been unsuccessful." *See Rakestraw*, 981 F.2d at 1533 (citations omitted).

*Air has similarly participated in and facilitated SWAPA's breach of the duty of fair representation.*

See Complaint at pp. 11–12 (emphasis added). Based on this statement, and given the limited role Morris appears to have played in this case, it can be surmised that Plaintiffs base Morris' liability at least partially on its status as a party to the SWAPA–Morris CBA—particularly since no evidence has been presented that Morris was involved in negotiations surrounding the Letter of Agreement. If so, Plaintiffs apparently believed that the challenged seniority terms had been incorporated into the SWAPA–Morris CBA, otherwise Morris could not have "similarly participated in and facilitated" SWAPA's alleged breach by "acquies[ing] in and enter[ing] into an agreement which it knew devastated the seniority rights of the Morris Air pilots."

Even if this were not the case, the language of the SWAPA–Morris CBA itself is sufficiently clear to inform Morris pilots that to ratify the CBA was also to ratify the effect of the Letter of Agreement. The SWAPA–Morris CBA clearly states that "the parties to this agreement recognize" that "Morris pilots will be transferred to the parent in accordance with the terms of an agreement between Southwest Airlines and the Association dated January 1, 1994." In view of the extensive oral and written information which the Morris pilots were provided regarding the Letter of Agreement, it would be disingenuous to suggest that they were unaware of either the existence or terms of the aforementioned "agreement between Southwest Airlines and the Association." Indeed, the events culminating in the Letter of Agreement were so critical to the Morris pilots' livelihoods that the court must conclude that they knew or should have known every detail contained in that document.

In addition, the SWAPA–Morris CBA states that "[u]pon transfer to Southwest Airlines, Morris Air pilots will become part of the pilot bargaining unit at Southwest Airlines and will be governed by the collective bargaining agreement between the Association and Southwest Airlines." Plaintiffs con-

cede that they knew that the Letter of Agreement was an amendment to the SWAPA–Southwest CBA. See Plaintiffs' Opposition Memo. at p. 5. Thus, if parties to the SWAPA–Morris CBA "recognized" that transfer pilots would be governed by the SWAPA–Southwest CBA, Plaintiffs must have known that ratifying the SWAPA–Morris CBA signified assent to the seniority arrangements contained in the amendment to the SWAPA–Southwest CBA.

Furthermore, there is no evidence—nor have Plaintiffs alleged—that the Morris pilots were excluded from negotiation of the SWAPA–Morris CBA or that either SWAPA or Morris withheld information concerning its contents or effect. It is undisputed that two Morris pilots participated in the negotiation of the SWAPA–Morris CBA as members of the SWAPA team. In addition, two meetings were held to explain the terms of that document, and copies of the proposed SWAPA–Morris CBA were made available to the entire Morris pilot group. There is no evidence suggesting that SWAPA discouraged questions, comments, or objections at those meetings. Thus, in view of the fact that the Morris pilots had extensive prior information regarding the Letter of Agreement, they must have recognized the implications of the seniority arrangement implicit in the SWAPA–Morris CBA.

Moreover, Plaintiffs do not dispute that the specific section of the SWAPA–Morris CBA which is at issue here was explained in the meetings. Although Plaintiffs concede that the explanation was given, however, they argue that Defendants have failed to show that this explanation was sufficient to allow the Morris pilots to make "a knowing and voluntary waiver." See Plaintiffs' Response Memo. at p. 10, n.7. In particular, Plaintiffs contend that "[w]e are left in the dark concerning what Mr. Palmason may have said about Section 1." Id. Despite this assertion, however, Plaintiffs themselves have presented no affidavits or other evidence stating or suggesting that the explanation given was deficient in any way.

Finally, Plaintiffs' remaining contention—that even a negative vote on the SWAPA–Morris CBA would not have given the Morris

pilots the right to reject the seniority integration—is speculative. It is uncontroverted that the Morris pilots, as SWAPA members, overwhelmingly ratified a contract which specifically subjected them to the terms of a document that contained apparently distasteful seniority provisions. It is therefore futile to contend that SWAPA would not have allowed the Morris pilots to stand on their assumed rights if they had chosen *not* to ratify the CBA. After all, the SWAPA–Southwest CBA is a fluid document that could again be amended by either Southwest or SWAPA.

In short, Plaintiffs and other Morris pilots were, or should have been, well–informed as to both the Letter of Agreement and the SWAPA–Morris CBA. There are no allegations of irregularities during either SWAPA–Morris CBA negotiations or voting, and relevant information was readily available to all who chose to avail themselves of it. Nor have Plaintiffs presented evidence that the disputed section of the SWAPA–Morris CBA was either incorrectly or inadequately explained. As the Seventh Circuit has stated:

> A voluntary choice may not be withdrawn because the choice was an effort to make the best of a bad situation. Adult pilots, of sound mind and well aware of the consequences of their acts, must expect to keep their contracts, even when they wish they could have made better deals.

*Rakestraw*, 981 F.2d at 1534.

Therefore, in consideration of the foregoing and the fact that Plaintiffs' first three causes of action are interrelated,[30] it is the court's opinion that the May of 1994 vote by Morris pilots in favor of the SWAPA–Morris CBA ratified SWAPA's disputed actions and the seniority arrangement, thereby disposing of all three claims.[31]

### B. Plaintiff Pratt's Wrongful Termination Claim

Plaintiffs' fourth cause of action alleges that Southwest wrongfully terminated the employment of plaintiff Pratt "because of the filing of the original Complaint, in violation of the Railway Labor Act and public policy." *See* Complaint at p. 13. Southwest has filed for summary judgment on this claim, contending that: (1) the RLA does not create a private cause of action, (2) neither Arizona nor Texas public policy exceptions to at–will employment apply in this situation, and (3) the undisputed facts show that the Southwest management personnel who terminated Pratt's employment were unaware that this lawsuit had been filed. Plaintiffs counter that: (1) the RLA and the All Writs Act, 28 U.S.C. § 1651, allow this claim, (2) the Utah public policy exception to at–will employment allows this claim, and (3) the factual posture of this claim makes it inappropriate for summary judgment.

Regarding the federal prong of Plaintiffs' claim, the court agrees with Southwest's argument that the All Writs Act does not provide an independent basis for jurisdiction over this claim. *See, e.g., Commercial Sec. Bank v. Walker Bank & Trust Co.*, 456 F.2d 1352, 1355 (10th Cir.1972); *Telecommunications Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 77 (D.C. Cir.1984). Nor does a

---

**30.** The essence of the first claim is that SWAPA breached its DFR both when it negotiated the seniority integration provisions contained in the Letter of Agreement "without the participation of the [Morris Committee]," and also when it did not permit the Morris pilots to vote on the Letter of Agreement. *See* Complaint at pp. 10–11. In addition, it is contended that Southwest is liable under this claim due to its alleged participation in and *facilitation of SWAPA's breach of DFR* by "succumbing to pressure from SWAPA to acquiesce in and enter into an agreement which it knew devastated the seniority rights of the Morris Air pilots." *See id.* at pp. 11–12. Like Southwest, Morris' liability is based on "similarly par-

ticipat[ing] in and facilitat[ing] SWAPA's breach." *Id.* at p. 12.

Plaintiffs' second and third claims are outgrowths of this alleged breach and assert violations of SWAPA's constitution/bylaws and LMRDA because SWAPA failed "to offer and accord plaintiffs and the other Morris pilots an opportunity to join SWAPA and to participate in a separate ratification vote on the Letter of Agreement in their own bargaining unit." *See* Complaint at p. 12.

**31.** Because the court finds that ratification of the SWAPA–Morris CBA is dispositive, the statute of limitations and duty of fair representation issues will not be addressed.

private cause of action exist under the RLA for those "who assert retaliatory conduct based upon employee activities which bear no relationship to establishing a union, or to employer activities that bear no relationship to undermining a union." *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1023 (9th Cir.), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1319, 108 L.Ed.2d 495 (1990).

Regarding the state–law public policy prong of the claim, the parties appear uncertain as to which state law should apply.[32] This issue need not be decided here, however, due to the court's disposition of this final claim in Plaintiffs' Complaint.

It is well–settled that "pendent [supplemental] jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Moreover, the justification for the exercise of supplemental jurisdiction:

> lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer–footed reading of applicable law. Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well.

*Id.; see also*, 28 U.S.C. § 1367(c)(3) (stating that district court may decline exercise of supplemental jurisdiction over state claims if it has dismissed claims over which it had original jurisdiction).

In this case, litigation has not proceeded to the point that Plaintiffs would be prejudiced if this claim was dismissed. Therefore, in the exercise of its discretion, the court declines jurisdiction over plaintiff Pratt's wrongful termination claim, which is grounded in a state–law–based public policy exception to the at–will doctrine.

### C. Motion for Class Certification

Also pending before the court is one final motion: Plaintiffs' Motion to Certify a Plaintiff Class or, in the Alternative, to Defer Consideration of Class Certification Issues Until the Damages Phase of This Litigation, Case No. 94–C–660W (Jan. 23, 1995). The court informed counsel by a letter dated March 23, 1995 that it would delay consideration of this motion pending resolution of the instant summary judgment motions.

In view of the fact that all conceivable bases for class certification have been disposed of by this memorandum decision and order, the court finds that Plaintiffs' motion is moot, and it is therefore denied.

### V. ORDER

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED:

1. Plaintiffs' motion for partial summary judgment is hereby DENIED.

2. Defendant SWAPA's motion for summary judgment is hereby GRANTED.

3. Defendant Morris' motion for summary judgment is hereby GRANTED.

4. Defendant Southwest's motion for summary judgment as to claim number one is hereby GRANTED.

5. Plaintiff Michael Pratt's wrongful termination claim is DISMISSED WITHOUT PREJUDICE.

6. Plaintiffs' motion for class certification is hereby DENIED.

DATED this 11th day of August, 1995.

---

**32.** Contrary to Southwest's contention, the Arizona Supreme Court appears to recognize a public policy exception to the at–will doctrine for employees discharged for "exercis[ing] a legal right or privilege." *Wagner v. City of Globe*, 150 Ariz. 82, 722 P.2d 250, 256 (1986) (en banc); *see also, Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 710 P.2d 1025 (1985) (en banc) (establishing public policy exception to at–will doctrine).